**In the Interest of E.G.L., a Child.**

**No. 05–11–00854–CV.**

Court of Appeals of Texas, Dallas.

Aug. 20, 2012.

Rehearing Overruled Oct. 4, 2012.

James S. Latimer, Southlake, TX, for Appellant.

Lon L. Garner, The Garner Firm, McKinney, TX, M. Michael Mowla, M. Michael Mowla, PLLC, Duncanville, TX, for Appellee.

Before Justices O'NEILL, MARTIN RICHTER, and LANG–MIERS.

## OPINION

Opinion By Justice LANG–MIERS.

Tasha S. (Mother) and James L. (Father) lived together for a time and had a child, E.G.L. (E.), in 2002. Around 2005, Mother and Father's relationship ended and Mother and Devin H. (Stepfather) moved in together. Mother and Stepfather also had a child, A.F.H. (A.). In 2009, Mother and Stepfather separated, and Stepfather filed this suit to adjudicate his parentage of A., to adjudicate Father's

parentage of E., and to seek appointment as both A.'s and E.'s sole managing conservator.

Mother initially contested Stepfather's petition seeking conservatorship of A. and E., but soon thereafter she and Stepfather agreed to become "co-parents" of the children. Father contested Stepfather's petition seeking conservatorship of E. and asked for a jury trial. Before trial, Mother and Stepfather agreed to be appointed joint managing conservators of both children, with Stepfather as the conservator with the exclusive right to designate the primary residence of both children. The only issue submitted to the jury was whether Stepfather or Father should be designated as the conservator with the exclusive right to designate E.'s primary residence. The jury found in favor of Stepfather, and the trial court rendered an order appointing Mother and Stepfather as joint managing conservators of A. and E., with Stepfather having the exclusive right to designate the primary residence of the children, and Father as possessory conservator of E. Father appeals, raising several issues in his pro se brief. We affirm the trial court's order.

### DOES THE INDIAN CHILD WELFARE ACT APPLY?

■ In issue one with multiple sub-issues, Father argues that the Indian Child Welfare Act (ICWA) applies to this custody proceeding and that the trial court erred by not applying its provisions. We disagree.

In 1978, Congress passed the ICWA to address the "rising concern in the mid–1970's [sic] over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 32, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). *Accord Doty–Jabbaar v. Dallas Cnty. Child Servs.,* 19 S.W.3d 870, 874 (Tex.App.-Dallas 2000, pet. denied). The ICWA was primarily intended to "apply only to situations involving the attempts of public and private agencies to remove children from their Indian families, not to inter-family disputes or divorce proceedings." *Comanche Nation v. Fox,* 128 S.W.3d 745, 753 (Tex.App.-Austin 2004, no pet.).

The ICWA states that it applies to a "child custody proceeding," which it defines as:

(i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;

(ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;

(iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and

(iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.

Such term or terms shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce

proceeding, of custody to one of the parents.

25 U.S.C. § 1903(1) (2001).

Whether the ICWA applies to this proceeding is a matter of statutory interpretation. We review a trial court's interpretation of a statute de novo. *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex.1989); *see Doty–Jabbaar*, 19 S.W.3d at 874. In construing a federal statute, federal law mandates that we look first to the statute's language to determine whether the language is plain and unambiguous. *Omnibus Int'l, Inc. v. AT & T, Inc.*, 111 S.W.3d 818, 821 (Tex.App.-Dallas 2003, pet. granted, judgm't. vacated w.r.m.). If the language is clear, we interpret the statute according to its plain language. *See id.; Doty–Jabbaar*, 19 S.W.3d at 874.

The only definition that is implicated in this proceeding is "foster care placement," which consists of four requirements: (1) the removal of an Indian child from the child's parent or Indian custodian, (2) temporarily placing the child in a foster home or institution or the home of a guardian or conservator, where (3) the parent or Indian custodian cannot have the child returned upon demand, and (4) parental rights have not been terminated. 25 U.S.C. § 1903(1)(i).

Father argues that "there is no question that this is a child custody proceeding." But he does not argue how this proceeding satisfies the four prongs of "foster care placement" contained in the ICWA. Stepfather argues that this proceeding did not involve "foster care placement" because the "only issue before the trial court was who should be the conservator of [E.], which means that this case was a 'custody' proceeding between private parties." He also contends that none of the ICWA's provisions are implicated because a parent of E. was appointed joint managing conservator of E.

In Stepfather's petition, he sought sole managing conservatorship of E., which, if granted, would satisfy prongs one, three, and four. But Father does not argue how appointing Stepfather as sole managing conservator of E. satisfies the second prong of "temporary placement in a foster home or institution or the home of a guardian or conservator." The ICWA does not define "temporary placement." The plain and ordinary meaning of "temporary" is "lasting for a time only: existing or continuing for a limited time: impermanent, transitory." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2353 (1981). And the plain and ordinary meaning of "placement" is "a transfer of custody (as of a minor ...)." *Id.* at 1728. Based on the common everyday meaning of temporary and placement, Stepfather's petition seeking sole managing conservatorship of E. did not seek "temporary placement" of E.

Other states have held that the ICWA does apply to proceedings between a parent and a nonparent, but those cases did not turn on the plain meaning of the statutory language "temporary placement." *See, e.g., J.W. v. R.J.*, 951 P.2d 1206, 1208 (Alaska 1998) (ICWA applied to dispute between father and stepfather over custody of Indian child where no question that stepfather was awarded temporary guardianship of child), *overruled on other grounds by Evans v. McTaggart*, 88 P.3d 1078 (Alaska 2004); *Empson–Laviolette v. Crago*, 280 Mich.App. 620, 760 N.W.2d 793, 796 (Mich.Ct.App.2008) (ICWA applied to dispute between mother and nonparents where no question that nonparents were appointed temporary guardians of Indian child); *In re Guardianship of Ashley Elizabeth R.*, 116 N.M. 416, 863 P.2d 451, 452–53 (N.M.Ct.App.1993) (ICWA applied to

dispute over custody between Navajo Nation and deceased mother's aunt with no discussion of "temporary placement").

Additionally, the petition sought to establish Father's status as E.'s father, not to remove E. from Father. And after the trial court adjudicated Father as E.'s father and appointed him possessory conservator of E., the court ordered and Texas law imposed certain legal rights and duties on Father with respect to E. *See* TEX. FAM.CODE ANN. §§ 153.071–.193 (West 2008 & Supp.2012) (setting out possessory conservator's legal rights and duties with respect to child). Consequently, we conclude that the proceeding was not an "action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a conservator." *See Fox,* 128 S.W.3d at 753 (concluding ICWA did not apply to child custody modification proceeding in which grandparents sought removal of mother as joint managing conservator and appointment of grandparents as managing conservators and mother as possessory conservator of Indian child). Because we conclude that the ICWA does not apply to this proceeding, we do not need to consider Father's remaining arguments under issue one. We resolve issue one against appellant.

### DID STEPFATHER HAVE STANDING TO SEEK CUSTODY OF E.?

■ In issue two, Father challenges Stepfather's standing to seek conservatorship of E. We conclude that the trial court did not err when it found Stepfather had standing.

■ The family code defines who has standing to file an original suit affecting the parent-child relationship. *See* TEX. FAM.CODE ANN. § 102.003 (West Supp. 2012). A party seeking relief "must plead and establish standing within the parameters of the language used in the code." *In re M.K.S.-V.,* 301 S.W.3d 460, 464 (Tex. App.-Dallas 2009, pet. denied). Because standing is a question of law, we review the trial court's decision on standing de novo. *Id.*

Stepfather contended that he has standing to file the suit under section 102.003(a)(9). Section 102.003(a)(9) states that an "original suit may be filed at any time by: . . . a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition[.]" TEX. FAM.CODE ANN. § 102.003(a)(9). "The purpose of section 102.003(a)(9) is to create standing for those who have developed and maintained a relationship with a child over time." *In re A.C.F.H.,* No. 04-11-00322-CV, 2012 WL 726940, at *1 (Tex.App.-San Antonio Mar. 7, 2012, no pet.). In computing the time under section 102.003(a)(9), "the court may not require that the time be continuous and uninterrupted but shall consider the child's principal residence during the relevant time preceding the date of commencement of the suit." TEX. FAM.CODE ANN. § 102.003(b).

Stepfather filed this original suit on March 27, 2009, and, tracking the language in section 102.003(a)(9), alleged that he had standing because he was a person "who has had actual care, custody and possession of the children for at least six months ending not more than 90 days preceding the date of filing of this petition. . . ." Father contested that allegation of standing, however, and argued that Stepfather "admitted that he lied in his petition and that [E.] actually resided with the mother in Dallas County at the time" he filed the petition. He also contends that Stepfather's petition is "fraud on the court" and tampering with a governmental record be-

cause the children did not live with Stepfather at the time he filed the petition. He argues that Stepfather's pleadings should be struck and the case dismissed.

At a hearing on the issue of Stepfather's standing, Stepfather testified that Mother and E. began living with him around late 2005 or early 2006. Stepfather testified that Mother was rarely at home because she was attending school and working part-time. He said he was "cast completely into the role of raising [E.] almost entirely full-time .... so [E.] spent more time with me than she did with her mother." Stepfather testified that he and Mother had a child, A., in December 2007, and in November 2008, Stepfather purchased a home in Allen, Texas, because he wanted the children to attend school in the Allen school district. The four of them lived there as a family until February 18, 2009, when Mother left with both children. Stepfather filed this original suit on March 27, 2009, less than 90 days later. The trial court ruled that Stepfather had standing to file the original suit.

Father has not cited any evidence in the record supporting his contention that Stepfather "lied" in his petition about the children's residence. Father contends that Stepfather said the children were living with him at the time he filed the petition when they were actually living with Mother. But Stepfather's petition merely tracked the language of section 102.003(a)(9). And section 102.003(a)(9) does not require the child to be living with the person who filed the petition at the time the petition was filed—it requires only that the person had actual care, control, and possession of the child for at least six months, and that this six-month period did not end more than ninety days before the petition was filed. *See* Tex. Fam.Code Ann. § 102.003(a)(9). The evidence showed that Mother and E. lived with Stepfather since late 2005 or early 2006,

that Mother and E. left Stepfather in February 2009, and that Stepfather filed this petition in March 2009. We conclude that Stepfather established his standing to file this original suit, and that Stepfather's petition was not a "fraud on the court" or tampering with a governmental record.

■ Father also argues for the first time on appeal that section 102.003 of the family code is unconstitutional "as interpreted and applied" by the court. He contends that section 102.003 as interpreted and applied by the trial court "would give any Petitioner in the State of Texas the legal right to ask for, and receive, custody of another party's child simply by virtue of the child's mother residing with said Petitioner." And he contends that this "unlawfully divest[s] and deprive[s] a fit parent of Constitutionally protected rights and access to their child."

To preserve an issue for appeal, a party must make a timely, specific objection or motion in the trial court that states the grounds for the desired ruling with sufficient specificity to make the trial court aware of the complaint. Tex.R.App. P. 33.1(a); *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex.1993) ("As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal."). Father does not cite, and we have not found, where he raised this specific constitutional argument about family code section 102.003 in the trial court. Consequently, we conclude that this argument presents nothing for our review. *Dreyer*, 871 S.W.2d at 698 (declining to address constitutional argument not raised in trial court). We resolve issue two against appellant.

### Does the Final Order Violate Father's Constitutional Rights?

■ In his final issue, Father raises additional constitutional arguments. His entire argument states:

Appellant [Father] asserts that Amendment XIV, Section 1 of the Constitution of the United States of America was violated when the trial court issued Temporary Orders, and again when it issued Final Orders, which permanently removed the Indian child, [E.], from his legal and physical custody. Said Orders deprived Appellant of his Constitutionally protected rights to direct the care, control, custody, education, and religious upbringing of his child without good cause, without Due Process, without a showing of parental unfitness, in direct violation of the Federal [ICWA], and in direct violation of the United States Constitution.

■■■ Initially we note that temporary orders are not appealable. *In re K.N.K.,* No. 05–10–01053–CV, 2011 WL 489932, at *1 (Tex.App.-Dallas Feb. 14, 2011, no pet.) (mem. op.). Consequently, we do not consider Father's arguments with regard to temporary orders issued in this case.

With regard to the final order, Father does not state the portion of the final order about which he specifically complains. And although Father complains that the trial court deprived him of his constitutionally protected parental rights in the final order, the record shows that, instead, the final order established Father as the child's father and specifically identified his rights and duties to the child as follows:

1. the right to receive information from any other conservator of the child concerning the health, education, and welfare of the child;

2. the right to confer with the other parent to the extent possible before making a decision concerning the health, education, and welfare of the child;

3. the right of access to medical, dental, psychological, and educational records of the child;

4. the right to consult with a physician, dentist, or psychologist of the child;

5. the right to consult with school officials concerning the child's welfare and educational status, including school activities;

6. the right to attend school activities;

7. the right to be designated on the child's records as a person to be notified in case of an emergency;

8. the right to consent to medical, dental, and surgical treatment during an emergency involving an immediate danger to the health and safety of the child; and

9. the right to manage the estates of the child to the extent the estates have been created by the parent or the parent's family.

. . .

1. the duty to inform the other conservator of the child in a timely manner of significant information concerning the health, education, and welfare of the child; and

2. the duty to inform the other conservator of the child if the conservator resides with for at least thirty days, marries, or intends to marry a person who the conservator knows is registered as a sex offender under chapter 62 of the Code of Criminal Procedure or is currently charged with an offense for which on conviction the person would be required to register under that chapter. . . .

And the order states that during Father's time of possession, he has the following rights and duties concerning E.:

1. the duty of care, control, protection, and reasonable discipline of the child;

2. the duty to support the child, including providing the child with clothing, food, shelter, and medical and dental care not involving an invasive procedure;

3. the right to consent for the child to medical and dental care not involving an invasive procedure; and

4. the right to direct the moral and religious training of the child.

We conclude that Father did not establish that the final order "permanently removed the Indian child, [E.], from his legal and physical custody" or violated his constitutionally protected parental rights. To the extent Father is actually complaining that he should have been appointed managing conservator instead of possessory conservator, we point out that the standard for conservatorship in Texas is always what is in the best interest of the child, not the best interest of the parent. TEX. FAM.CODE ANN. § 153.002 (West 2008) ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

 In meeting the requirement to specify the rights and duties of each conservator regarding the "physical care, support, and education" of a child, a trial court has "broad discretion in crafting the rights and duties of each conservator so as to effectuate the best interest of the child." *In re M.A.M.*, 346 S.W.3d 10, 18 (Tex. App.-Dallas 2011, pet. denied). *See* TEX. FAM.CODE ANN. § 153.134(b)(2); *In re M.P.B.*, 257 S.W.3d 804, 811 (Tex.App.-Dallas 2008, no pet.). We will not reverse a trial court's decision unless the court acted arbitrarily, unreasonably, or without reference to any guiding rules or principles. *In re M.P.B.*, 257 S.W.3d at 811–12. A trial court does not abuse its discretion if some evidence of a substantial and pro-

bative character exists to support the court's decision. *Id.*

Under an abuse of discretion standard, whether the evidence is sufficient is not an independent ground for asserting trial court error, but it is a factor we consider in assessing whether a trial court abused its discretion. *Id.* at 811. But Father does not argue that the evidence is insufficient to support the trial court's decision to appoint him possessory conservator instead of managing conservator. And Father does not explain how the evidence in this case does not support the trial court's decision with regard to E.'s best interest. For example, he does not argue any of the factors we traditionally consider in determining a child's best interest, such as the child's desires, the child's current and future physical and emotional needs, any physical or emotional danger to the child in the present or future, the parental abilities of the individuals involved, the programs available to those individuals to promote the child's best interest, the plans for the child by those individuals, the stability of the home, acts or omissions by a parent tending to show that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *In re K.L.W.*, 301 S.W.3d 423, 426 (Tex.App.-Dallas 2009, no pet.) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976)).

 Regardless, we have reviewed the evidence and cannot conclude that the trial court abused its discretion by appointing Father possessory conservator. The evidence showed that Mother sought and obtained two protective orders against Father—one in 2003 and one in 2005. A review of Father's trial testimony shows that Father had little relationship with E. over the years and did not regularly exercise his rights to visitation. In responding to many questions about his relationship

with Mother, Father invoked his right under the Fifth Amendment not to answer questions about family violence. Father was unable to name E.'s school, her teacher, the activities in which she is involved, or other details one would expect a parent to know about his child.

■ On the other hand, Stepfather testified that he had raised E. since she was three years old and E. refers to him as "daddy." He testified that he loves E. as his own, he is on the board of directors for E.'s elementary school PTA, chairman of the Dad's Club at E.'s elementary school, serves as E.'s Girl Scout troop leader, and is her Destination Imagination coach. He testified that he and Mother agreed that the children would live with him so they could continue to attend Allen schools. Stepfather testified that while he and Mother "live in different households . . . [they] do everything together. We go to holidays together. . . . We attend all of the same functions. . . . We are always around." Stepfather testified that Mother is also a leader in the Girl Scouts and Destination Imagination and attends PTA meetings with him. He testified that he and Mother split all expenses of the children "down the middle."

Stepfather also testified that he and Mother want supervised visitation for Father because "every bit of evidence that's been offered to me regarding his character and regarding . . . his actions and the words he has said and the threats that he has made indicate that his intent, given the first possible opportunity at unsupervised visitation, is to remove [E.] from the State of Texas onto Indian territory where the jurisdiction of—the Court does not hold jurisdiction. And we are afraid that she would be kidnapped." Stepfather also testified that Father told him "that he would never, ever, ever stop litigation in this case. . . ." And Stepfather testified that E.

told him that "she had a dream that her father kicked the door down of her mother's house and killed her mother and took her away . . . ."

Mother explained that her relationship with Father began when she was only 15 and Father was 25. Even though Mother's grandmother ended the relationship, Mother said Father was always showing up at places she went and stalked her during that time. In 1997 when Mother was 17, she attempted suicide because of the turmoil in her life, which she described as "[c]hildhood trauma, years of abuse, and him," referring to Father. She said Father manipulated her friends and tried to turn them against her and to use them to find out information about her.

When she and Father began a relationship again around 2002, Father often became angry and assaulted her. She described how Father sometimes took his anger at her out on his own son from a different relationship. She said the last time she and Father were together, Father threatened to hunt her down and kill her. She said after Father left for work, she "grabbed" E. and her photo album, and left that night. She also got a protective order. And she testified that she feared for E. if Father was given custody of her.

Mother testified that E.'s behavior changed after visiting Father, and a report to Child Protective Services was made by the school relating to her behavior. She said E. would get into trouble at school for a week or two after she visited Father. Mother said Father "hasn't been around" E., and for the past three years, he has seen E. "a handful of times," went to two or three of E.'s soccer games, has not provided financial support and has not provided medical insurance. She testified that she believed it was in A.'s and E.'s best interests to remain together with

Stepfather in Allen. She also testified that as between Father and Stepfather, E. would be "better off" with Stepfather because "[h]e has been the dad, he has taken care of her with me." She testified that she knows "what's in [E.'s] best interest.... That's why I am willing to give [Stepfather] primary residence."

Angela A. testified that she knows Mother, Stepfather, and Father. She said she talked to Father within the last two to three years, while this case was pending, and he told her that he would "give that b—— a hot-shot and take [E.] and go live on the Indian reservation where no one can find us." Angela said Father told her that a "hot-shot" is "an overdose of heroin." She testified that in her opinion Father would not be the best person to raise E. because he is not "a stable human being, stable person" because he threatened to kill the child's mother.

Johnni C., Mother's friend, also testified that she has known both Mother and Father for years. She and Mother were friends when Mother and Father first began having a relationship when Mother was 15. Johnni described Mother and Father's relationship as "insane." She said she heard Father "talk bad" to Mother; heard him "call her derogatory names," and saw him hit her. She described an incident when she and Mother were young and at Mother's grandmother's house. Johnni saw someone on the roof of grandmother's house looking through the skylight. She went outside and saw Father on the roof. They yelled at each other, and he jumped down and ran off. She also described a later incident after she had married and moved into an apartment. She said Mother was there "due to an earlier incident between" Mother and Father. Someone started banging on the door, and they knew it was Father so they did not answer the door. She said everything got quiet, and about twenty minutes later, Father was standing on her third floor balcony looking inside the apartment; she said there was no stairway access to the balcony. She said it scared them, and she told Mother to hide. Johnni went to her bedroom and retrieved a shotgun her dad had given her. Although the gun was not loaded and she had no ammunition for it, she opened the blinds and pointed the gun at Father. He left the balcony. She also described an incident in which Father pinned her between his truck and Mother's truck.

Johnni also testified that after her address became part of the court records for this proceeding, she moved to a new residence because of Father's "track record of stalking both myself and [Mother]." She said Father has threatened to kill her and her mother and she wanted to prevent him from having access to her.

We have considered the entire record and conclude that the trial court did not abuse its discretion in determining the conservatorship of E. We resolve issue three against appellant.

### CONCLUSION

We affirm the trial court's order.