**Affirmed in part; Reverse and Remand in part; and Opinion Filed June 13, 2016**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-01171-CV

## IN THE INTEREST OF K.G., A CHILD

**On Appeal from the 301st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-06-10047**

## MEMORANDUM OPINION

Before Justices Lang, Brown, and Whitehill
Opinion by Justice Whitehill

This suit affecting the parent–child relationship requires us to decide whether (i) the evidence supported a grandmother's standing to seek modification of a parent–child relationship order and (ii) the trial court's order granting such relief was supported by the evidence or violated the mother's constitutional rights.

Here, the trial court's modification order designated K.G.'s Mother, Father, and paternal grandmother (Grandmother) joint managing conservators. Among other things, the order also (i) gave Grandmother the exclusive right to designate K.G.'s primary residence and certain other exclusive rights, and (ii) restricted Mother's possession rights. Mother appealed.

As discussed below, we conclude that on this record (i) Grandmother had sufficient care, control, and possession of K.G. to support her standing, (ii) there was sufficient evidence

supporting the family code elements of modification, but (iii) the trial court erred by giving Grandmother a "right to first refusal" whenever Mother was unable to exercise her possession of K.G. for more than three hours.

Accordingly, we reverse the restriction the trial court placed on Mother's possession rights, affirm the order in all other respects, and remand for further proceedings.

## I. BACKGROUND

K.G. was born in October 2002. When he was three years old, the trial court appointed Mother and Father as his joint managing conservators and authorized Mother to determine K.G's primary residence.[1] The order also required Father to pay Mother child support.

In October 2012, the attorney general petitioned to increase Father's child support. Father contested that request, asserting that K.G. did not actually stay with Mother. The docket sheet reflects that the court ruled on the attorney general's motion in November 2012, but the order is not in our record.

In March 2013, Grandmother petitioned to modify the parent–child relationship, asking that she, Mother, and Father be appointed K.G.'s joint managing conservators and that she be given the exclusive right to designate K.G.'s primary residence. She also asked that Mother and Father be required to pay child support to her.

The trial court rendered temporary orders adding Grandmother as a joint managing conservator and giving her standard possession of K.G. pursuant to family code § 153.317.

Licensed professional counselor Jessica Rogers prepared a social study and filed it with the court. The study opined that it was in K.G.'s best interest to live with Grandmother (and her husband, Grandfather).

---

[1] Although the conservatorship order that appears in the appellate record is not signed by the judge, both sides' briefs state that the order was entered.

In August 2014, the trial judge held a bench trial at which Rogers, Grandmother, and Mother testified.

The trial judge later signed an order granting Grandmother's motion. The order (i) appointed Grandmother, Mother, and Father joint managing conservators of K.G.; (ii) gave Grandmother the exclusive right to designate K.G.'s primary residence within Dallas County or any contiguous county, as well as certain other exclusive rights; and (iii) gave Mother possession rights similar to those in the Texas Standard Possession Order, but qualified those rights with a "Right to First Refusal" provision that would cede Mother's possessory rights to Grandmother any time Mother could not exercise her possession of K.G. for more than three hours. The order also required Mother and Father to pay Grandmother child support.

Mother timely filed a pro se new trial motion, which did not state any specific grounds, and a pro se notice of appeal. Seventy days after judgment, and now acting through counsel, Mother filed an amended new trial motion. The trial judge, however, never ruled on either motion.

## II. ISSUES

Mother raises three issues:

1.  The trial court violated Mother's fundamental rights under the United States and Texas Constitutions and also violated the Texas Family Code.

2.  The trial court erred by finding that Grandmother proved sufficient grounds to modify the parent–child relationship.

3.  The trial court erred by ruling that Grandmother had standing.

As discussed below, we disagree with issues two and three, and we agree with issue one in part and disagree with it in part.

## II. ANALYSIS

**A.      Issue Three:  Did the trial court err by concluding that Grandmother had standing?**

We address Mother's third issue first because it concerns subject matter jurisdiction.  *See In re M.K.S.-V.*, 301 S.W.3d 460, 463 (Tex. App.—Dallas 2009, pet. denied) ("Standing is a component of subject matter jurisdiction[.]").  As discussed below, we hold that Grandmother had standing to seek the requested modification because the record contains evidence that Grandmother had actual care, control, and possession of K.G. for the statutorily required period.

### 1.      Error Preservation and Standard of Review.

Mother did not raise standing below until her amended motion for new trial, which was never heard by the trial court.  Nevertheless, there is no error preservation defect because standing can be raised for the first time on appeal.  *See In re A.C.F.H.*, 373 S.W.3d 148, 150 (Tex. App.—San Antonio 2012, no pet.).

Standing is a legal question that we review de novo.  *In re E.G.L.*, 378 S.W.3d 542, 547 (Tex. App.—Dallas 2012, pet. denied).  Because Mother in effect challenges Grandmother's standing for the first time on appeal, we construe Grandmother's petition in her favor and review the entire record to determine whether any evidence supports standing.  *See In re A.C.F.H.*, 373 S.W.3d at 150; *In re L.N.E.*, No. 05-07-01712-CV, 2009 WL 280472, at *2 (Tex. App.—Dallas Feb. 6, 2009, no pet.) (mem. op.).

### 2.      Applicable Law.

A person seeking conservatorship must have standing to sue.  *In re M.K.S.-V.*, 301 S.W.3d at 463.  To that end, he or she must plead and establish standing within the family code's parameters.  *Id.* at 464.

Here, Grandmother alleged standing under § 102.003(a)(9), which confers standing on

> a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition[.]

–4–

TEX. FAM. CODE § 102.003(a)(9).

Actual care, control, and possession has been found to exist when the person asserting standing (i) lived in the same house as the child or lived in a home where the child consistently and frequently stayed overnight; (ii) financially supported the child; (iii) participated in the child's education; and (iv) fed, clothed, and provided health care to the child. *Jasek v. Tex. Dep't of Family & Protective Servs.*, 348 S.W.3d 523, 534 (Tex. App.—Austin 2011, no pet.).

Section 102.003(b) further provides that § 102.003(a)(9)'s  required six month period need not be continuous and the court must consider the child's principal residence during the relevant time period:

> In computing the time necessary for standing under Subsections (a)(9), (11), and (12), the court may not require that the time be continuous and uninterrupted but shall consider the child's principal residence during the relevant time preceding the date of commencement of the suit.

*Id.* § 102.003(b).

A "principal residence" is a fixed place of abode that is (i) occupied consistently over a substantial time period and (ii) permanent rather than temporary. *In re M.P.B.*, 257 S.W.3d 804, 809 (Tex. App.—Dallas 2008, no pet.).

Additionally, we have said that § 102.003(a)(9)'s purpose is to give standing to a person who has developed and maintained a relationship with a child over time. *In re E.G.L.*, 378 S.W.3d at 547.

### 3.     The Evidence.

Grandmother filed her petition on March 11, 2013, and pled her standing under family code § 102.003(a)(9).  The question then is whether there is any evidence that Grandmother had

actual care, control, and possession of K.G. for at least six months ending after December 11, 2012 (90 days before Grandmother sued). *See* FAM. § 102.003(a)(9).[2]

The evidence supports the following facts: When K.G. was born in October 2002, Mother, a high school sophomore, and Father were both teenagers. They could not take responsibility for K.G., who was with Grandmother and Grandfather daily. Mother and Father broke up in late 2004 when K.G. was about two years old.

Mother took possession of K.G. in 2005, when he was between two and three years old. However, because Mother frequently left him in others' care, she agreed to leave K.G. with Grandmother and Grandfather so that K.G. would be safer.

Grandmother testified that:

(i) After getting possession of K.G., Grandmother enrolled him in day care because he had developed behaviors such as "hitting and throwing stuff."

(ii) She put K.G. in tutoring for attention deficit disorder and dyslexia, and she paid for the tutoring.

(iii) She took K.G. to basketball and track after school four days a week.

(iv) From 2006 to 2013, a weekend was the longest K.G. ever stayed with Mother.

Mother's testimony about K.G.'s living arrangements up to March 2013 was vague. She said that she started a job in 2008, that she didn't have a set schedule, and that Grandmother "volunteered to help [Mother] pick [K.G.] up from school and help [Mother] do stuff back and forth." Her attorney later asked additional questions about her possession of K.G.:

Q      How often were you seeing [K.G.] prior to March of 2013?

A      I was seeing him—he was going back and forth.

---

[2] To have standing under § 102.003(a)(9), Grandmother also must not be K.G.'s foster parent. Mother does not challenge this aspect of § 102.003(a)(9) standing, so we do not address it.

Q How often?

A Maybe like once or twice a week so maybe if—if I—before I got my car if—if I didn't have him, he would stay at granny's house. If I have him that day and I couldn't take him to school, she would meet me and pick him up and take him to school.

She also testified under cross-examination about her possession of K.G.:

Q But how long would you say you would have him, for a day or two?

A No, I didn't have him for a day or two. We was going back and forth.

Q When the social study reports that you were gone three to four weeks at the time back and forth, that's all false?

A The child was going back and forth from her house to my mother's house where I stayed.

She further indicated that the arrangement might have continued indefinitely had Father's child support not been increased: "Everybody was getting along. Everything was going great until they thought I went up on the child support."

Counselor Jessica Rogers testified that:

(i)    K.G. consistently told her that he was predominately with Grandmother.

(ii)   Grandmother provided K.G. with testing and enrolled him in sports.

(iii)  Many of the professionals involved with K.G.'s care "definitely felt like grandma was the most available, present person."

(iv)   K.G.'s medical records indicated that Grandmother had primarily cared for K.G. over the years.

(v)    K.G. told Rogers that Grandmother was more likely to help him with his homework and that Grandmother was better at getting him to bed on time.

Rogers's social study, which was admitted into evidence, reported the following:

(i)    K.G. told Rogers that "home was at his Granny's house."

(ii)   He also said that "he had lived there at his Granny's house most of his life as his 'mom couldn't pick him up.'"

(iii)  Moreover, K.G. "communicated he wanted to just visit with his mother like he used to."

–7–

(iv)    Grandmother was the one who arranged for K.G. to be tested (for unspecified reasons) at Scottish Rite Hospital.

**4.    Application of the Law to the Facts.**

Based on the foregoing evidence, the trial court could reasonably find that from 2006 to 2013 K.G. largely lived with Grandmother and occasionally had short visits with Mother. The trial court was also entitled to believe Grandmother's evidence that she made decisions regarding K.G.'s upbringing, education, and medical care from 2006 to 2013. In sum, there is evidence that Grandmother had actual care, control, and possession of K.G. for more than six months ending in 2013, which would be within 90 days of Grandmother's suit.

Under § 102.003(b), we must also consider K.G.'s principal residence during the relevant time period, keeping mind that "continuous and uninterrupted" care, control, and possession are not required. FAM. § 102.003(b). Grandmother testified that she had lived continuously in her residence since 1994, showing that her house was a fixed abode that was occupied consistently over a substantial time period. *See In re M.P.B.*, 257 S.W.3d at 809. There was also evidence that K.G. lived with Grandmother most of the time and that this arrangement was open-ended rather than temporary. There is thus evidence that Grandmother's house was K.G.'s principal residence until this custody dispute arose in March 2013.

Accordingly, taking § 102.003(b) into account, we conclude that there is some evidence that Grandmother had actual care, control, and possession of K.G. for at least six months ending less than 90 days before she sued. *See* FAM. § 102.003(a)(9).

Finally, recognizing Grandmother's standing on these facts promotes the statutory purpose of giving standing to those who have developed and maintained a relationship with a child over time. *See In re E.G.L.*, 378 S.W.3d at 547.

### a.     Precedents Supporting Grandmother.

Our *In re M.P.B.* and *In re M.K.S.-V.* opinions support our holding that Grandmother had standing.

For example, in *M.P.B.*, a child's mother died when the child was 20 months old. 257 S.W.3d at 807. The child's grandmother successfully sued for conservatorship, and we affirmed her standing under § 102.003(a)(9). *Id*. at 807–10. The evidence showed that the mother and child lived near the grandmother, but the child actually spent more time at the grandmother's house than at the mother's apartment. *Id*. at 809. The child spent every weekend and one additional night during the week at the grandmother's house, and if the grandmother had any time off work the child would also stay with her then. *Id*. The grandmother was also significantly involved in raising the child, such as clothing her and teaching her to spell her name. *Id*. This pattern lasted from the child's birth until her mother's death. *Id*. We further noted that the grandmother's possession of the child was not intended to be a temporary arrangement to address temporary difficulties. *Id*. We thus held that § 102.003(a)(9) was satisfied, even though the grandmother's care, control, and possession of the child was not exclusive and was exercised with the mother's consent. *Id*.

Here, Grandmother's care, control, and possession of K.G. was comparable to, or more extensive than, the care, control, and possession that M.P.B.'s grandmother exercised. As in *M.P.B.*, the custody arrangement in this case was open-ended, and there is no indication that the parties intended it to be temporary. Although Grandmother's possession of K.G. was not exclusive and was exercised with Mother's permission, *M.P.B.* shows that these facts do not defeat § 102.003(a)(9) standing. Thus, *M.P.B.* supports Grandmother's standing.

And, in *M.K.S.-V.*, T.S. had a child while involved in a relationship with K.V. 301 S.W.3d at 462. The relationship ended when the child was one year old, but T.S. and K.V.

agreed that K.V. would possess the child overnight once a week, alternate weekends, and alternate Sunday afternoons. *Id.* This arrangement lasted for over a year. *Id.* Then T.S. ended the arrangement, and a month later K.V. sued for conservatorship or adoption. *Id.* The trial court found that K.V. lacked standing to sue for conservatorship and dismissed K.V.'s suit. *Id.* at 463. We reversed, citing the parties' agreed custody arrangement and several additional facts supported K.V's standing. Those additional facts included that:

(i)      The child had a room and playthings at K.V.'s house.

(ii)     K.V. sometimes picked the child up from school when she was sick and bought and administered medication.

(iii)    K.V. was listed as a parent on the child's school records.

(iv)     K.V. attended the child's school activities, and the child's teachers knew that K.V. would sometimes pick the child up from school.

(v)      K.V., T.S., and the child attended church as a family unit. *Id.* at 465.

Grandmother's care, custody, and possession of K.G. in the present case was similar to, or more extensive than, K.V.'s care, custody, and possession of the child in the *M.K.S.-V.* case. Thus, *M.K.S.-V.* also supports Grandmother's standing.

### b.      Mother's Cases.

In arguing against Grandmother's standing, Mother relies on *In re K.K.C.*, 292 S.W.3d 788 (Tex. App.—Beaumont 2009, orig. proceeding), and *In re Kelso*, 266 S.W.3d 586 (Tex. App.—Fort Worth 2008, orig. proceeding). We are not persuaded.

In the *K.K.C.* case, a man lived with a woman and her child for seven years until his relationship with the woman ended. 292 S.W.3d at 789–91. He then sued for conservatorship rights over the child. *Id.* at 789–90. The mother challenged the man's standing, and he adduced evidence that his relationship with the child was substantially like that of a parent. *Id.* at 791. The trial court rejected the mother's challenge, but the Beaumont Court of Appeals, with one justice dissenting, granted the mother mandamus relief. In so doing, the Beaumont court

–10–

construed the statutory "control" requirement to mean the authority to make legally significant decisions for the child, and concluded that the man had no legal right of control over the child and no authority to make decisions on the child's behalf. *Id*. at 793. The court also emphasized that the mother always lived with the child, adequately cared for the child, and did not relinquish or abdicate her parental rights, duties, and responsibilities. *Id*.

*K.K.C.*, however, is factually distinguishable from the instant case because K.K.C.'s mother lived with the child the whole time that the nonparent seeking conservatorship also lived with the child. *Id*. This arguably undermined the man's claim that he ever had "actual care, control, or possession" of the child. By contrast, K.G. lived with Grandmother and away from Mother for substantial periods, during which Grandmother indisputably had care and possession of K.G.

Moreover, we have not required parties seeking standing under § 102.003(a)(9) to demonstrate authority to make legally significant decisions for the child to demonstrate "control." *See In re M.K.S.-V.*, 301 S.W.3d at 465; *In re M.P.B.*, 257 S.W.3d at 809. Rather, as these cases show, we have in effect given "control" its ordinary meaning of "power or authority to guide or manage: directing or restraining domination." *Control*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1981). This is proper statutory interpretation. *See City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003) ("We look first to the plain and common meaning of the statute's words.") (internal quotations and citation omitted). To the extent *K.K.C.* holds that § 102.003(a)(9) requires a formal, legal right of control, we disagree with it.[3]

In *Kelso*, a child's paternal grandparents sought to be named the child's sole managing conservators, and the child's mother challenged their standing. 266 S.W.3d at 588. The

---

[3] The Austin Court of Appeals has also rejected *K.K.C. See Jasek*, 348 S.W.3d at 535 (rejecting position that § 102.003(a)(9) requires "that the person seeking standing have ultimate legal authority to control a child").

grandparents presented evidence that the child had lived with them and away from his mother for most of the year preceding the grandparents' petition. *Id.* The trial court signed a temporary order making the grandparents joint managing conservators, *id.* at 587, but the Fort Worth Court of Appeals, with one justice dissenting, granted mandamus relief based on lack of standing. In so doing the Fort Worth court emphasized that: (i) the mother never relinquished permanent care, control, and possession of the child to the grandparents and (ii) the mother always controlled when and how long the child stayed with the grandparents. *Id.* at 590–91. The court thus held that (i) there was no evidence that the child's abode with the grandparents was fixed or permanent and (ii) the evidence showed that his abode with them was temporary, although up to several months at a time, and depended on the mother's consent. *Id.* at 591.

We disagree with *Kelso*'s analysis because that court indicated that a nonparent cannot have actual care, control, and possession of a child unless the child's parent voluntarily relinquishes permanent care, control, and possession of the child to the nonparent. *Id.* at 590. But § 102.003 does not require a voluntary and permanent relinquishment of rights. *See* FAM. § 102.003; *see also Jasek*, 348 S.W.3d at 535 (disagreeing with *Kelso*).

Moreover, our *M.K.S.-V.* opinion establishes that a nonparent who has periodic care, control, and possession of a child with the child's parent's agreement can still establish standing under § 102.003(a)(9). 301 S.W.3d at 464–65. We are obliged to follow our own precedents. *See MobileVision Imaging Servs., L.L.C. v. LifeCare Hosps. of N. Tex., L.P.*, 260 S.W.3d 561, 566 (Tex. App.—Dallas 2008, no pet.) ("We may not overrule a prior panel decision of this Court absent an intervening change in the law by the legislature, a higher court, or this Court sitting en banc.").

### c.     Other Precedent From This Court.

Finally, we distinguish our *In re I.I.G.T.*, 412 S.W.3d 803 (Tex. App.—Dallas 2013, no pet.), decision.  In that case, the trial court granted a mother's plea to the jurisdiction attacking a nonparent's standing to seek conservatorship, and the nonparent appealed.  *Id.* at 804–05.  The nonparent testified that, for the six months before he filed suit, the child stayed with him every weekend pursuant to a permanent arrangement with the mother.  *Id.* at 806.  The mother, however, testified that the child never lived with the nonparent but only visited him on visits that were arranged on an individual basis.  *Id.* at 807.

Emphasizing the standard of review, and distinguishing *M.P.B.* and *M.K.S.-V.*, we held that the evidence permitted the trial court to conclude that the nonparent's possession of the child was intended to be temporary rather than permanent, and that the parties did not intend the nonparent's house to be a permanent rather than a temporary abode for the child.  *Id.* at 808–09.

Here, however, the evidence supports the premises that (i) the parties intended Grandmother's frequent possession of K.G. to be an indefinite rather than a temporary arrangement and (ii) Grandmother's house was K.G.'s permanent (although not uninterrupted) abode.

For the above reasons, we disagree with Mother's third issue.

### B.     Issue Two:  Did the trial court erroneously conclude that Grandmother proved sufficient grounds to modify the parent–child relationship?

Mother's second issue argues that the trial court erred by concluding that (i) a material and substantial change in circumstances occurred after the original custody order was signed, (ii) Mother voluntarily relinquished primary care and possession of K.G. for at least six months, and (iii) the modification was in K.G.'s best interest.  We disagree with this issue because the trial court's conclusions were supported by some substantive and probative evidence.

### 1.     Standard of Review.

We review an order modifying conservatorship for abuse of discretion. *In re C.C.J.*, 244 S.W.3d 911, 917 (Tex. App.—Dallas 2008, no pet.).  A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to any guiding principles. *Id*.

Under this standard, legal and factual insufficiency are not independent grounds of error, but they are relevant factors in our review. *Id*.  We review the evidence in the light most favorable to the order and indulge every presumption in its favor. *Id*.  If some probative and substantive evidence supports the order, the challenge fails. *See id*.

### 2.     Applicable Law.

The trial court may modify a conservatorship order if (i) modification would be in the child's best interest and (ii) either (a) the circumstances of the child, a conservator, or another party affected by the order have materially and substantially changed since the order was rendered or (b) the conservator who had the exclusive right to designate the child's primary residence voluntarily relinquished primary care and possession of the child to another person for at least six months.  FAM. § 156.101(a)(1)(A), (a)(3).

As the petitioner, Grandmother had the burden of proving the necessary elements by a preponderance of the evidence. *See In re A.B.P.*, 291 S.W.3d 91, 96 (Tex. App.—Dallas 2009, no pet.).  Grandmother pled both changed conditions and voluntary relinquishment as grounds permitting modification.  The trial court's order found that Grandmother's material allegations were true.

### 3.     Does the evidence support a material and substantial change in circumstances?

To prove that circumstances have materially and substantially changed, a petitioner must show the conditions that existed when the order was rendered and what material changes have since occurred. *In re C.C.J.*, 244 S.W.3d at 919.

–14–

We first consider the evidence of the conditions that existed when the original conservatorship order was rendered, which occurred in May 2006 when K.G. was three years old. Grandmother testified that K.G. lived with her from the age of about two or two and a half until he was ten, with only short visits with Mother of a day or two at a time. She also testified that K.G. "was a sweet child" when in roughly 2005 she took custody of him.

We next consider whether there is evidence that any relevant circumstances materially and substantially changed after the original order was rendered. *See id.* Grandmother testified that she put K.G. in day care at some point after she took custody of him because "he had started hitting and throwing stuff." As K.G. grew up, Grandmother became aware that K.G. had other problems. She testified that K.G. "had ADD, dyslexia, and he had—he has attachment disorder." She also said that K.G. had problems with anger and stealing. She put K.G. in tutoring to address his ADD and dyslexia, and she took him to counseling for his anger issues. Finally, she testified that K.G. has demonstrated learning disabilities in reading and math.

Although Grandmother did not adduce evidence expressly establishing that K.G.'s ADD, dyslexia, attachment disorder, issues with anger and stealing, and learning disabilities arose or were diagnosed after the May 2006 order was rendered, we conclude that there is a reasonable inference that some or all of these conditions arose or were diagnosed after May 2006. The trial court could reasonably infer that many of these conditions—dyslexia, stealing issues, and learning disabilities in reading and math in particular—either did not exist or had not been detected in May 2006, when K.G. was three years old and the original order was rendered.

We further conclude that the trial court could reasonably determine that K.G.'s post-May 2006 psychological and behavioral problems were material and substantial changes in K.G.'s circumstances under § 156.101(a)(1)(A). *Cf. In re A.L.E.*, 279 S.W.3d 424, 429 (Tex. App.—

–15–

Houston [14th Dist.] 2009, no pet.) (post-order diagnosis that child suffered panic attacks was a factor supporting changed circumstances).

The trial court thus did not abuse its discretion by implicitly finding that K.G.'s conditions had materially and substantially changed.

### 4. Does the evidence support a conclusion that Mother voluntarily relinquished primary care and possession of K.G. for at least six months?

We also conclude that the trial court did not abuse its discretion by implicitly finding that Mother voluntarily relinquished primary care and possession of K.G. for at least six months. *See* FAM. § 156.101(a)(3).

The statute does not define the term "voluntarily relinquished." *See id.* Mother argues that it requires the managing conservator's affirmative agreement to give up the child, rather than mere tolerance or acquiescence, citing *Norman v. Norman*, 683 S.W.2d 548, 550 (Tex. App.—Fort Worth 1985) (en banc), *rev'd on other grounds*, 692 S.W.2d 655 (Tex. 1985) (per curiam). *But cf. In re S.A.H.*, 420 S.W.3d 911, 922 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Thus, 'voluntarily relinquish' can be construed as meaning 'to give up by one's own free will.'").

Assuming without deciding that Mother is correct and § 156.101(a)(3) requires a showing that the conservator with the right to designate the child's primary residence has affirmatively agreed to give another primary care and possession of the child, we conclude that there is evidence to support that finding here. As previously noted, Grandmother testified that K.G. lived with her from the age of about two or two and a half until he was ten, with only short visits with Mother of a day or two at a time. This arrangement began when Grandmother contacted Mother and proposed it. Specifically, Grandmother testified:

> I said [to Mother], you know, if you are going to be dropping him off, drop him with me because I feel like that was safer. So I got him—I guess he might have been two, two and a half.

–16–

Grandmother then testified that K.G. stopped living primarily with her when he was ten. She also said that Mother voluntarily allowed K.G. to stay with her and that Mother relinquished K.G.'s care to Grandmother for more than a year.

The above is some evidence that Mother voluntarily agreed to allow K.G, to live with Grandmother when he was about two or two and a half and that Grandmother continued to have primary care and possession of K.G. for roughly another seven years after the original conservatorship order was rendered.

Also, Rogers (the counselor who performed the social study) testified, based on doctors' records, that Grandmother, not Mother, "had primarily cared for this child over the years." She also testified that K.G. himself told her that he had predominately been with Grandmother.

Mother, however, argues that the trial court erred because she testified that (i) she did not give K.G. up to Grandmother, (ii) she did not intend K.G. to live permanently with Grandmother, and (iii) K.G. went back and forth between Mother's home and Grandmother's home. But in a bench trial, the trial court is the fact-finder and the sole judge of witness credibility. *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.). Accordingly, the trial court was free to discredit or disbelieve Mother's testimony.

The trial court thus did not abuse its discretion by implicitly finding that Mother voluntarily relinquished the primary care and possession of K.G. to another person for at least six months.

**5. Did the trial court abuse its discretion by determining that the requested modification was in K.G.'s best interest?**

**a. Applicable Law.**

In determining a child's best interest, a court may consider, among other things,

(i) the child's desires;

(ii) the child's current and future emotional and physical needs;

–17–

(iii)   any emotional or physical danger to the child;

(iv)   the parental abilities of the individual seeking custody and her plans for the child;

(v)   the stability of the home;

(vi)   acts or omissions by a parent tending to show the existing relationship is not a proper one; and

(vii)   any excuse for the acts or omissions of the parent.

*See In re S.N.Z.*, 421 S.W.3d 899, 910 (Tex. App.—Dallas 2014, pet. denied) (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)).

Additionally, Texas public policy is  to (i) assure a child's frequent and continuing contact with parents who are capable of acting in the child's best interest, (ii) provide a safe, stable, and nonviolent environment for the child, and (iii) encourage parents to share in the parental rights and duties after they have separated or divorced.  FAM. § 153.001(a).

### b.   Application of the Law to the Facts.

Substantial evidence supports the trial court's decision.  Grandmother adduced evidence that K.G. suffers from several psychological difficulties and learning disabilities and that while she had possession of K.G. she sought tutoring and counseling to help him with these problems.  Once Mother reacquired possession of K.G., she stopped taking him to counseling.  Grandmother also enrolled him in extracurricular activities such as basketball and track.

According to Jessica Rogers's social study, Mother's residence reeked of urine, apparently because of K.G.'s dog, and there were many small roaches in the refrigerator.  Furthermore, after March 2013, when K.G. began living primarily with Mother, he told Rogers that he "much wished" that he were living with Grandmother.  He also said there was less fighting at Grandmother's house, and that Mother and her live-in girlfriend frequently fought with yelling and screaming.  Although K.G. had not seen any physical violence, he had heard them break a lamp in another room.

–18–

Additionally, the social study opined that K.G.'s best interest would be to live with Grandmother and Grandfather "in the fashion in which he has been afforded the most consistency and love over the course of time." The study also said, "It is hoped that [K.G.] can again find his predominant care being overseen by his grandparents in which he seems to most greatly thrive while being allowed visitation to his mother during the time she is off on the weekends."

Rogers further testified that she thought Mother was "well intentioned" but "there's a miss in her being consistent." K.G. told Rogers that he was able to be "more of a kid" at Grandmother's house because she took care of breakfast and his clothes and things like that. He also said that Grandmother was more likely to help him with homework and that she was better than Mother at getting to bed on time.

On the other hand, Rogers also testified that K.G. had said both that he would like to be with Mother and that he didn't care who he lived with. He also said that if he had a bad day he would talk to Mother about social problems. Rogers believed that Mother was getting K.G. to school on time and was making sure he was fed. Rogers found nothing in her report to indicate Mother would significantly impair K.G.'s mental, physical, or emotional wellbeing. But she also testified that she would be concerned about K.G.'s physical welfare and would possibly be concerned about his educational welfare if he were with Mother.

Mother emphasizes the parts of Rogers's testimony that are favorable to her position. She also points to evidence that she has had the same job for six years. She was present for K.G.'s psychological and dyslexia testing at the hospital and at school. She denied that her previous residence had a urine stench or roaches in the refrigerator, and there was also evidence that she moved from that residence after Rogers's visit. Mother also introduced evidence that K.G.'s grades did not suffer after Grandmother started this proceeding and that K.G. started to

live mostly with Mother. And she observes that the social study reflects that Grandfather was convicted of shoplifting in 1974 when he was 19.

Because the trial court is in the best position to observe the witnesses and their demeanor we give it great latitude when determining a child's best interest. *In re S.E.K.*, 294 S.W.3d 926, 930 (Tex. App.—Dallas 2009, pet. denied). Here, the trial court observed the witnesses and weighed the evidence. Grandmother adduced favorable evidence regarding many of the best interest factors, including K.G.'s desires, K.G.'s physical and emotional needs, her and Mother's parental abilities, and the stability of her home. Although Mother adduced evidence favorable to her position as well, it was the trial court's prerogative to weigh the evidence. *See In re A.M.*, 418 S.W.3d at 841.

The modification order also furthers Texas public policy by giving K.G. both (i) frequent and continuing contact with Mother and (ii) a safe and stable environment.

Based on the above, we cannot conclude that the trial court acted arbitrarily or unreasonably by granting Grandmother's request for modification.

We disagree with Mother's second issue.

**C.    Issue One: Did the trial court commit constitutional or legal error by rendering the modification order?**

Mother's first issue raises several distinct arguments positing that the trial court committed error by rendering the modification order:

(i)    The federal and Texas constitutions required the trial court to give Mother's determinations about her child special weight, and the trial court erred by failing to do so.

(ii)    The trial court erred by awarding Grandmother certain exclusive rights that Grandmother had not requested in her pleadings.

(iii)    The trial court erred by failing to make a written finding that the limitations placed on Mother's rights and duties were in K.G.'s best interest, as required by family code § 153.072.

–20–

(iv)     There was no evidence supporting the award of certain rights exclusively to Grandmother.

(v)     The trial court erred by giving Grandmother a "Right to First Refusal" if, during a time of Mother's possession, Mother would be unable to exercise her possession of K.G. for more than three hours.

## 1.     Did Mother preserve her constitutional argument?

Mother's first argument is that the modification statute, § 156.101, is unconstitutional under the federal Due Process Clause, the Texas Due Course Clause, and *Troxel v. Granville*, 530 U.S. 57 (2000), because it does not require the trial court to give a fit parent's decisions about her child special weight in conservatorship decisions.   She also contends that the constitutional infirmity could be overcome in modification cases by applying the "parental presumption" found in § 153.131.   But Mother did not raise this argument in the trial court until she filed her untimely amended motion for new trial.

Appellate complaints must be preserved by timely request, objection, or motion in the trial court. TEX. R. APP. P. 33.1(a)(1).   Even constitutional arguments must be preserved in the trial court.   *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001).   An untimely amended motion for new trial, however, does not preserve error for appeal. *Moritz v. Preiss*, 121 S.W.3d 715, 720–21 (Tex. 2003).   Our sister court of appeals has held that the same argument Mother is making here must be preserved in the trial court.   *Jhaveri v. McBeth*, No. 03-14-00261-CV, 2015 WL 8591659, at *8 (Tex. App.—Austin Dec. 10, 2015, pet. filed) (mem. op.).   We agree.

We therefore conclude Mother did not preserve her constitutional argument.

## 2.     Did the trial court abuse its discretion by awarding Grandmother certain exclusive rights?

The trial court awarded Grandmother exclusive rights to: (i) represent K.G. in legal actions and to make other decisions of substantial legal significance concerning K.G., (ii) consent to marriage and to enlistment in the armed forces, (iii) make decisions concerning K.G.'s

–21–

education, and (iv) act as K.G.'s agent regarding K.G.'s estate if a state requires K.G.'s action. Mother argues that these awards are erroneous because (i) Grandmother did not request them in her pleading and (ii) there is no evidence to support them.

### a. Pleading Defect.

We conclude that Mother did not preserve her pleading defect argument for appeal. Specifically, Mother could have raised this argument in a motion for new trial or motion to modify the judgment, but she did not do so. Accordingly, Mother did not preserve error, and we do not address this argument. *See* TEX. R. APP. P. 33.1(a)(1); *Tucker v. Thomas*, 405 S.W.3d 694, 712 (Tex. App.—Houston [14th Dist.] 2011) (en banc) (party did not preserve argument that award of attorneys' fees was unsupported by pleadings), *rev'd on other grounds*, 419 S.W.3d 292 (Tex. 2013); *Halla v. Halla*, No. 14-06-01126-CV, 2007 WL 2367600, at \*3 (Tex. App.—Houston [14th Dist.] Aug. 21, 2007, no pet.) (mem. op.) (party did not preserve argument that opponent failed to plead elements necessary to support modification).

### b. Sufficiency of the Evidence.

Mother contends that there is no evidence to support the trial court's decision to give Grandmother the exclusive rights listed above. We are not persuaded.

As to K.G.'s education, there was evidence that Grandmother was better at helping K.G. with his homework and made efforts to help K.G. succeed academically with extra tutoring.

As to the other rights at issue, it is true that there is no evidence specifically addressing, for example, whether Mother or Grandmother would be better able to represent K.G. in a legal action. But there was evidence that Grandmother generally offered K.G. greater consistency and availability than Mother could and that Grandmother would be a stable influence in his life given her 35 years of marriage and 20 years of residency in the same house. From this evidence, the trial court could reasonably conclude that, on balance, Grandmother would be better able to look

after K.G.'s interests if he needed a legal representative, if he wanted to marry or enter the military before attaining majority, or if he needed an agent to act on behalf of his estate.

Accordingly, we conclude the trial court did not abuse its discretion.

### 3. Did Mother preserve her argument that the trial court failed to make a finding under family code § 153.072?

Mother argues that the trial court violated family code § 153.072 by limiting her rights without making a written finding that the limitations are in K.G.'s best interest. But she did not request findings of fact or otherwise bring her complaint to the trial court's attention. Accordingly, she did not preserve the argument for appeal. *See* TEX. R. APP. P. 33.1(a)(1); *cf. Avalos v. Avalos*, No. 2-08-012-CV, 2008 WL 5115300, at *3 (Tex. App.—Fort Worth Dec. 4, 2008, no pet.) (mem. op.) (no abuse of discretion where party did not request finding under § 153.072).

### 4. Did the trial court abuse its discretion by giving Grandmother a "Right to First Refusal"?

Finally, Mother argues that the trial court abused its discretion by including a "Right to First Refusal" provision in the modification order. That part of the order provides:

> IT IS ORDERED THAT [Grandmother] shall have the right to first refusal in that if [Mother] is unable or unwilling to exercise access and possession of the child for more than 3 hours, th[e]n [Mother] is ORDERED to contact [Grandmother] at least 24 hours in advance of the time [Mother] is to have access to the child to give [Grandmother] notice that [Mother] will not be able to exercise possession.
>
> IT IS FURTHER FOUND THAT this [r]ight to first refusal also pertains to [Mother's] work schedule.

Mother argues that this provision is an abuse of discretion in light of family code § 153.193, which provides that an order that imposes limitations on a parent's right to possession of a child "may not exceed those that are required to protect the best interest of the child." FAM. § 153.193. For the reasons that follow, we agree with Mother.

–23–

Specifically, Mother relies on *In re H.D.C.*, 474 S.W.3d 758 (Tex. App.—Houston [14th Dist.] 2014, no pet.), which was a custody dispute over two children. *Id.* at 762. The father filed a petition to modify the parent–child relationship, and the resulting modification order (i) gave him the right to determine the children's primary residence and (ii) limited the mother's extended summer possession by requiring her to be "off work" and "present" to exercise that possession. *Id.* at 762–63.

On appeal, the mother argued that the limitation on her extended summer possession was an abuse of discretion under § 153.193. *Id.* at 763. The court of appeals agreed. *Id.* at 764–65. Although the evidence supported the premises that the children required constant adult supervision and that certain of the mother's relatives were not appropriate supervisors, the appellate court concluded that it was unduly burdensome and unnecessarily restrictive to require the mother herself to supervise the children. *Id.* Accordingly, it reversed and remanded so that the trial court could revise the restriction. *Id.* at 765. We agree with Mother that *In re H.D.C.* is closely on point.

Grandmother, however, argues that evidence supports the premise that the restriction is in K.G.'s best interest. For example, Jessica Rogers testified, "I worry about him being left at the apartment too much time while [Mother]'s going back and forth." Grandmother also points to the social study, which recounts Grandmother's statement that when K.G. was around two or three years old Mother "was dropping [K.G.] off to random places for others to provide care."

We agree with Mother that there is no evidence that K.G.'s best interest requires that Mother abide by the restrictions that the "Right to First Refusal" provision imposes. The evidence concerning Mother's handling of K.G.'s care when he was two or three years old is no evidence of K.G.'s best interest several years later. Assuming the evidence supports a requirement that Mother not leave K.G. unsupervised (a question we do not reach), we conclude

that the evidence does not show that K.G.'s best interest requires Mother to consult specifically with Grandmother about supervision instead of making some other suitable arrangement.

Accordingly, we conclude that the trial court abused its discretion by imposing the condition entitled "Right to First Refusal." *See id.* at 764–65. We further conclude that the appropriate remedy is reversal of that part of the order, and we remand for further proceedings for refashioning of the restriction, if any. *See id.* at 765.

### III. CONCLUSION

We reverse the part of the order entitled "Right to First Refusal," and we remand for the limited purpose of allowing the trial court to consider whether a restriction should be imposed and, if so, to fashion a restriction that conforms to the evidence. In all other respects, we affirm the trial court's order.

/Bill Whitehill/
BILL WHITEHILL
JUSTICE

141171F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF K.G., A CHILD,

No. 05-14-01171-CV

On Appeal from the 301st Judicial District Court, Dallas County, Texas
Trial Court Cause No. DF-06-10047.
Opinion delivered by Justice Whitehill.
Justices Lang and Brown participating.

In accordance with this Court's opinion of this date, we **AFFIRM** in part and **REVERSE** in part the September 9, 2014 Order in Suit to Modify Parent–Child Relationship.

We **REVERSE** the two paragraphs of the Order appearing under the heading "2. Right to First Refusal." We **AFFIRM** the Order in all other respects. We **REMAND** this cause to the trial court for further proceedings consistent with this Court's opinion.

It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered June 13, 2016.