

In The
Court of Appeals
Seventh District of Texas at Amarillo

_____

No. 07-21-00110-CV

_____

IN THE INTEREST OF J.S., G.S., AND I.F., CHILDREN

On Appeal from the County Court at Law Number 2
Potter County, Texas
Trial Court No. 93,891-2-FM; Honorable Carry Baker, Presiding

September 17, 2021

MEMORANDUM OPINION

Before PIRTLE and PARKER and DOSS, JJ.

Appellant, S.F., the mother of J.S., G.S., and I.F., appeals from the trial court's order terminating her parental rights to her children.[1]  Through four issues, she argues (1) the case must either be reversed or remanded for failure to comply with the notice requirements of the ICWA[2] and because the evidence was legally and factually

---

[1] To protect the privacy of the parties involved, we refer to them by their initials.  *See* TEX. FAM. CODE ANN. § 109.002(d).  *See also* TEX. R. APP. P. 9.8(b).

[2] The Indian Child Welfare Act of 1978 ("ICWA") establishes standards for the placement of Indian children in foster or adoptive homes.  The ICWA was enacted in order to prevent the breakup of Indian families and for other purposes.  95 P.L. 608, 92 Stat. 3069, 95 P.L. 608, 92 Stat. 3069. The ICWA requires that notice of a termination proceeding be given to each tribe in which the child is a member or is eligible for membership.

insufficient to support termination of her parental rights pursuant to (2) subsection 161.001(b)(1)(D), (3) subsection 161.001(b)(1)(O), and (4) subsection 161.001(b)(1)(P) of the Texas Family Code. We will affirm.

**BACKGROUND**

The underlying matter originally involved five children; however, only S.F., the mother of J.S., G.S., and I.F., has appealed. Three of the children, J.S., G.S., and I.F., share one mother (S.F.) and two of the children, E.F. and H.F., have another (B.O.).[3] I.F., E.F., and H.F. share the same father while J.S. and G.S. have a different father.[4] At the time of the final hearing, J.S. was fourteen years old, G.S. was eleven years old, and I.F. was ten years old. By the time of the hearing, the children were placed with fictive kin, F.L., a woman the children have known their "entire life, they consider her their sister."

On April 29, 2019, the Texas Department of Family and Protective Services received information alleging that S.F. and her husband were abusing methamphetamine. They were locking themselves in the bedroom of their home to use the drug. It was reported that the house was a mess and there were meth pipes in drawers in the home. There were also allegations of domestic violence during which S.F. called a family member to take the children from the home for their protection. The children did not want to return home due to the parental fighting and drug use. In mid-May, the Department received information that one of the children was afraid to be home and afraid to sleep because the parents were using methamphetamine and not protecting at least one of the younger children from one of the older children. A few days later, the Department

---

[3] B.O., the mother of E.F. and H.F. is not a party to this appeal.

[4] However, all five children treated S.F.'s husband as their father. Neither father is a party to this appeal.

2

received more information regarding these children, this time informing them that two of the children had an ongoing problem with lice and treatment was not being given. The Department discovered that the parents had a prior history regarding drug addiction, family violence, and non-compliance with the Department. A Department investigator also became aware that the children were removed from the care of S.F. and the father in 2009, following an injury to G.S. in which she sustained broken ribs and a skull fracture.

In December 2019, the Department filed an *Original Petition for Protection of a Child, for Conservatorship, and in the Alternative, for Termination in Suit Affecting the Parent-Child Relationship.* The court held a final hearing on the petition on January 28 and 29, 2021. Following the hearing, the court issued a final order terminating S.F.'s parental rights to J.S., G.S., and I.F. The court found that the Department established by clear and convincing evidence that S.F. (1) engaged in conduct or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children; and (3) used a controlled substance, as defined by chapter 481 of the Texas Health and Safety Code, in a manner that endangered the health or safety of the children. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (O), (P). The trial court also found that termination of S.F.'s parental rights was in the children's best interests. TEX. FAM. CODE ANN. § 161.001(b)(2).

**ANALYSIS**

**STANDARD OF REVIEW**

A trial court may terminate parental rights after finding by clear and convincing evidence that the parent's acts or omissions satisfy at least one predicate ground for

termination and that termination is in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (2). "Clear and convincing evidence" is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

The heightened burden of proof in parental termination cases "gives rise to a concomitantly heightened standard of appellate review." *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020) (per curiam). When the standard is clear and convincing, the distinction between legal and factual sufficiency "lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When performing a legal sufficiency review, the reviewing court "cannot ignore undisputed evidence contrary to the finding" but "must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630-31. Evidence is legally insufficient if, after conducting this review, the reviewing court concludes that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true. *In re Z.N.*, 602 S.W.3d at 545 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)).

However, a factual sufficiency review requires weighing disputed evidence contrary to the finding against all the evidence supporting the finding. *In re A.C.*, 560 S.W.3d at 631. The reviewing court must consider whether the "disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* Evidence is factually insufficient if "the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* (citing *In re J.F.C.*, 96 S.W.3d at 266). Under both standards, the reviewing court defers to the trier of fact's

4

determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)).

### ISSUE ONE—NOTICE UNDER ICWA

S.F.'s first issue is relevant only to one of her children, I.F.  I.F.'s father testified at the final hearing and stated, "I got real strong Indian blood in me, bro."  The father said he believed he was affiliated with the Zuni Tribe.  He later said his mother informed him his great-grandfather was Apache.  He also said the family is waiting for the grandfather to register with the Tribe and then the children can be tested.  On appeal, S.F. argues that while the Apache Tribe was notified and returned a letter stating that the father and I.F. are not members of the Tribe, no notice was sent to the Zuni Tribe.  S.F. argues that under the ICWA proceedings and guidelines, notice must be given to each tribe in which the child is a member or is eligible for membership.  Notice here was sent only to the Apache Tribe and accordingly, she asserts, this matter must be reversed or remanded for the proper notice to be provided.  Under the circumstances of this case, we disagree.

The ICWA was passed to address the "rising concern . . . over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *In re A.E.*, No. 05-17-00425-CV, 2017 Tex. App. LEXIS 9883, at *7 (Tex. App.—Dallas Oct. 20, 2017, pet. denied) (mem. op.) (citing *In re E.G.L.*, 378 S.W.3d 542, 545 (Tex. App.—Dallas 2012, pet. denied) (quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32, 109 S. Ct. 1597, 104 L. Ed. 2d 29 (1989)).  The ICWA "articulates a federal policy that, where possible, an Indian child should remain in the Indian community." *In re A.E.,* 2017

5

Tex. App. LEXIS 9883, at *8 (citing *In re T.R.,* 491 S.W.3d at 850 (citing *Miss. Band of Choctaw Indians,* 490 U.S. at 36-37). Pursuant to the ICWA, an Indian tribe is entitled to notice of a custody proceeding involving an Indian child. *In re A.E.,* 2017 Tex. App. LEXIS 9883, at *8 (citing *In re D.D.*, No. 12-15-00192-CV, 2016 Tex. App. LEXIS 2091 (Tex. App.—Tyler Feb. 29, 2016, no pet.) (mem. op. & abatement order) (citing 25 U.S.C. § 1912(a)).

The ICWA applies to an involuntary child custody proceeding pending in state court when "the court knows or has reason to know that an Indian child is involved" in a child custody proceeding. *In re A.E.,* 2017 Tex. App. LEXIS 9883, at *8 (citing 25 U.S.C. § 1912(a); *Doty-Jabbaar v. Dallas Cty. Child Protective Servs.*, 19 S.W.3d 870, 874 (Tex. App.—Dallas 2000, pet. denied)). An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *In re A.E.,* 2017 Tex. App. LEXIS 9883, at *8 (citing 25 U.S.C. § 1903(4)). "Reason to know," however, is not defined in the statute. *In re A.E.,* 2017 Tex. App. LEXIS 9883, at *8.

In 1979, 2015, and 2016, the federal Bureau of Indian Affairs ("BIA") published guidelines to assist state courts in their implementation of the ICWA. *Id.* at *8-9. Texas courts have looked to these non-binding guidelines in construing the ICWA. *Id.* (citing *In re R.R., Jr.*, 294 S.W.3d 213, 218-19 (Tex. App.—Fort Worth 2009, no pet.) (discussing courts' use of BIA Guidelines); *Doty-Jabbaar*, 19 S.W.3d at 876-77 (considering BIA Guidelines in determining qualifications of expert witness required by ICWA); *Yavapai-Apache Tribe v. Mejia*, 906 S.W.2d 152, 164 (Tex. App.—Houston [14th Dist.] 1995, orig. proceeding) (BIA Guidelines "not intended to have binding legislative effect" but "should be given important significance" in interpreting ICWA)). Further, the Department of the

Interior has disseminated regulations governing cases involving the ICWA.  *In re A.E.*, 2017 Tex. App. LEXIS 9883, at *9 (citing Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,864 (June 14, 2016) (codified at 25 C.F.R. pt. 23)).

The 2016 BIA Guidelines and 2016 Regulations discuss the phrase "reason to know" in section 1912(a) of the ICWA. Only one of the six factors listed in the 2016 Regulations is pertinent here:

> (c) A court . . . has reason to know that a child involved in an emergency or child-custody proceeding is an Indian child if: . . .
>
> (2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child . . . . 25 C.F.R. § 23.107(c).

The 2016 BIA Guidelines advise that "State courts and agencies are encouraged to interpret these factors expansively. When in doubt, it is better to conduct further investigation into a child's status early in the case; this establishes which laws will apply to the case and minimizes the potential for delays or disrupted placements in the future." *In re A.E.*, 2017 Tex. App. LEXIS 9883, at *9-10 (citing 2016 BIA Guidelines at 11). "A violation of the ICWA notice provisions may be cause for invalidation of the termination proceedings at some later, distant point in time."  *In re A.E.*, 2017 Tex. App. LEXIS 9883 at *10 (citing *In re D.D.*, 2016 Tex. App. LEXIS 2091 at *20) (citing 25 U.S.C. § 1914, providing, "Any Indian child who is the subject of any action for . . . termination of parental rights under State Law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction

to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.").

While we agree that the father stated "I got real strong Indian blood in me, bro" while testifying regarding a hair follicle test, we note the clerk's record includes documentation denoting that I.F.'s "American Indian child status" was denied by both parents. *Compare In re D.D.*, No. 12-15-00192-CV, 2016 Tex. App. LEXIS 2092, at *8 (Tex. App.—Tyler Feb. 29, 2016, no pet.) (mem. op.) (noting that the parents reported in three permanency plans and progress reports that the child was of possible "American Indian status" and that it was reported during a family group conference that the children's grandfather and father had "Indian Heritage" of "Cherokee and Comanche" descent and that such information was sufficient to trigger the ICWA's requirements for notification and determination of Indian status). The father admitted he did not inform the caseworker or anyone else at the Department of potential Indian heritage. Further, during the hearing, the father first told the court he was affiliated with the "Sunni" tribe (apparently meaning the Zuni Tribe). He later told the court he called his mother and was informed his great-grandfather was Apache. The court clarified it was not the "Sunni" tribe but rather the Apache Tribe. The court also clarified with the father that he was never registered as a member of the Apache Nation, nor had he ever asked for any of his biological children to be registered with the Apache Nation. After receiving this clarification, notice was provided to the Mescalero Apache Nation and the Tribe responded that neither the father nor I.F. are members of the Apache Tribe. The Tribe also stated it did "not wish to intervene through the court proceedings on this matter[.]"

Based on the record before us, we cannot conclude the trial court erred in failing to send notice to the Zuni Tribe. The court clarified with the father that the reference to

8

the Zuni Tribe was a mistake and instead, the father believed he was affiliated with the Apache Tribe via his great-grandfather. Consequently, the trial court had before it no "reason to believe" I.F. is affiliated with the Zuni Tribe and thus, no reason to provide notice to that tribe. We therefore overrule S.F.'s first issue.

### ISSUES TWO, THREE, AND FOUR—PREDICATE GROUNDS

The underlying court found that the Department had proven that termination was appropriate under subsections (D), (O), and (P). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (O), (P). S.F. challenges the evidence presented regarding each ground. We will only review the sufficiency of the evidence supporting the subsection (D) finding because "[o]nly one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination." *See In re N.G.*, 577 S.W.3d 230, 233 (Tex. 2019) (per curiam).

Subsection (D) authorizes termination if the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). In this context, to "endanger" means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). An endangerment analysis under subsection (D) focuses on evidence related to the children's environment. *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Children are endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it. *Id.* Drug use as well as inappropriate, abusive, or unlawful conduct by persons who live in the children's home or with whom the children are compelled to associate on a regular basis in the home is a part of the children's

9

environment. *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). A single act or omission can support termination under subsection (D). *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.).

The caseworker testified that S.F.'s most recent drug screen, taken in January 2021, revealed a positive result for methamphetamine. The investigator testified she had concerns about S.F.'s abilities as a parent because S.F. admitted to relapsing and using methamphetamine again. S.F. admitted she had several subsequent positive drug screens. However, she also testified she had several negative drug screens following the positive screens. S.F. nevertheless acknowledged she had been "kicked out" of intense outpatient rehabilitation due to a positive drug screen and had not returned to similar treatment. While we acknowledge that "mere drug use alone" is not conclusive to support a finding under subsection (D), we agree with the trial court that the evidence presented here proves a causal connection between S.F.'s drug use and endangering her children's welfare. *See In re L.C.L.*, 599 S.W.3d 79, 85 (Tex. App.—14th Dist.] 2020, pet. filed). *See also In re C.R.*, Nos. 07-20-00314-CV, 07-20-00316-CV, 2021 Tex. App. LEXIS 1286, at *8 (Tex. App.—Amarillo Feb. 23, 2021, pet. denied) (mem. op.). Both parents were using methamphetamine while the children were present. Both parents continued to use controlled substances during the pendency of the case. Drug paraphernalia was present in the home in areas in which the children had access. The home was "messy" and the children had lice that had been left untreated.

Further, S.F. also admitted to domestic violence between herself and her spouse to whom she was still married at the time of the final hearing. The investigator said that

on one occasion, S.F. called her sister-in-law to take the children because she and her husband were having an altercation. S.F. told the investigator that "she likes to get the children away from [her husband] when he gets angry." The investigator also described an incident in which she herself saw the anger from S.F.'s husband. He came outside with a large bin of tools and began "throwing them on the ground, throwing them across the yard" and cussed and screamed at his sister, who was also present. The investigator said that "at the end, he threw the bin across the yard, which I had to retreat to my car." The investigator testified that after that, she "was concerned about the safety of everyone involved."[5] The children told Department employees that they were scared to go home and did not want to see S.F. Of further concern to the investigator was that throughout the pendency of the case, S.F. "was very difficult to reach, and would disappear from time-to-time." Moreover, S.F. and the father had previous history with the Department. In 2009, four-month-old G.S. suffered a broken rib and a skull fracture. The children were removed from the home following that unexplained injury.

The record also shows that the visits between S.F. and J.S., G.S., and I.F. did not progress well. All three children eventually "decided to discontinue visitation with their parents." The caseworker testified, "[I]t takes a lot for a teenage child to say that they no longer want to see their parents. And the kids have—I've had conversations with each one of the kids, independent of each other, and they've all just indicated, at a different time, that they don't feel like the visits are healthy, and they usually would end up leaving the visits worse than when they went in." The CASA representative told the court, "we've

---

[5] During his testimony, the father denied this occurred and said he never threw the tools or threatened the investigator in any way. He said his sister wanted a drill he had borrowed. He took the drill out and "slam[med] it on the table." He denied throwing "any power tool anywhere in [his] yard" and said the investigator "never ran to her car, felt threatened." She stood at the passenger door of his sister's car, speaking with his sister.

11

had the joy of getting to know each of these five kids, with five different personalities, and five different options, and they've each came to the conclusion on their own to not pursue further visitation with [S.F.] and [the father]."

The guardian ad litem recommended that S.F.'s parental rights be terminated as to J.S., G.S., and I.F. She noted S.F. failed to put in the work necessary and opined that adoption would be best for each of the children. The record supports that assertion as it shows S.F. failed to complete several of her court-ordered services, including failure to complete a parenting class, a domestic violence class, WAVE classes, and outpatient drug treatment. She did complete a psychological evaluation and six individual counseling sessions. However, the caseworker opined that while S.F. "has tried, and she has given a little bit of effort" the caseworker did "not think that her efforts were sufficient in completing anything that she needed to do." S.F. agreed she had completed individual counseling and a psychological evaluation. She said she only attended two parenting classes due to Internet and scheduling issues. S.F. also testified she had completed eight or nine out of eighteen required domestic violence classes and had completed her OSAR. Lastly, she testified she was attending outpatient drug treatment and had completed four weeks. However, she said she missed a few sessions because she did not have a phone and then was removed from treatment after she had a positive drug screen. S.F. also excused her failure to complete her services by saying she attempted to contact service providers, but no one called her back.[6]

---

[6] We note this evidence also supports the trial court's finding that clear and convincing evidence existed sufficient to terminate S.F.'s parental rights pursuant to subsection 161.001(b)(1)(O).

Based on the above and foregoing, we find evidence in the record shows there is legally and factually sufficient evidence supporting the termination of S.F.'s parental rights to her three children pursuant to Family Code subsection 161.001(b)(1)(D).

BEST INTEREST

While S.F. does not directly address the evidence supporting the trial court's finding that clear and convincing evidence supported a finding that termination of her parental rights was in her children's best interests, we will briefly discuss that evidence here.[7]

In addition to finding sufficiency of the evidence to support termination under section 161.001(b)(1), we must also find clear and convincing evidence that termination of the parent-child relationship was in the children's best interests. TEX. FAM. CODE ANN. § 161.001(b)(2). There is a strong presumption that the best interests of the children will be served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the children in a safe environment is also presumed to be in their best interests. TEX. FAM. CODE ANN. § 263.307(a). A non-exhaustive list of factors to consider in deciding best interest is found at section 263.307(b) of the Family Code. TEX. FAM. CODE ANN. § 263.307(b). The Supreme Court has set out additional factors to consider when determining the best interest of the children. *See Holley*, 544 S.W.2d at 371-72. Those factors include (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the

---

[7] We note that the Department's position is that S.F. has conceded any issue regarding whether termination was in the children's best interests. Nevertheless, we address it here in the interest of justice.

13

individual to promote the best interests of the children; (6) the plans for the children by the individual or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

Evidence that supports one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the children's best interests. *See In re C.H.,* 89 S.W.3d at 28. *See also In re E.C.R.*, 402 S.W.3d 239, 249-50 (Tex. 2013). The best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence. *See In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.).

The record shows the trial court had before it significant evidence of S.F.'s drug use and had ample evidence of an unstable living environment, including domestic violence in the home. In addition to the evidence discussed concerning the predicate grounds under which the trial court terminated S.F.'s parental rights, we note also that the children's fictive kin placement, F.L., desired to adopt the three children. All three children were doing very well in the home. The caseworker testified the Department had no concerns about the children's continued placement.

The record also shows that S.F. testified she was employed with Murphy's USA as a shift leader and had been for two years. She also said she "got" a house "two days ago" but reluctantly admitted she was no longer living in her previous residence because she was "behind a little" on the rent. She acknowledged she had moved in with her parents for six months to "get [herself] situated" after she was no longer able to live at

that residence.  She also admitted she had told the Department that she could not "afford those things because the Department would not provide [her] funds to get a home[.]"

Further, as discussed above, S.F. only completed some of her services and made excuses for not completing others. As noted, the guardian ad litem recommended that S.F.'s parental rights be terminated as to each of her children and opined that adoption would be best for each of the children.  Additionally, the CASA representative was of the same opinion.

We find the evidence in the record supports the trial court's finding that termination of S.F.'s parental rights to each of her children was in their best interests.  Concluding the record supports the trial court's findings under the requisite standards, we resolve S.F.'s second issue against her.  Issues three and four are pretermitted.  *See* TEX. R. APP. P. 47.1.

### CONCLUSION

Having resolved S.F.'s first and second issues against her and having pretermitted issues three and four, we affirm the trial court's *Order of Termination.*


Patrick A. Pirtle
Justice