

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

————————————————

No. 02-23-00128-CV

————————————————

IN THE INTEREST OF C.C., A CHILD

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-718278-22

Before Kerr, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

In this appeal from a judgment terminating the parent–child relationship between C.C. and her alleged father after C.C.'s mother's death from a drug overdose, Father challenges the maternal aunt and uncle's standing to sue; the evidence's legal and factual sufficiency on the trial court's predicate-conduct and best-interest findings; and procedural due process.[1] We affirm.

## Background

Mother died on March 19, 2022,[2] and C.C. went to live exclusively with her Aunt and Uncle. At the time, Father was incarcerated for aggravated assault with a deadly weapon—in 2019, he had run over Mother with a car. On June 6, 2022—not quite three months after Mother's death—Aunt and Uncle filed an original petition to terminate the parent–child relationship between C.C. and Father.

In their petition, Aunt and Uncle alleged specifically that Father had (1) failed to support C.C. according to his ability for one year ending within six months of the petition's file date; (2) with knowledge of Mother's pregnancy, voluntarily abandoned Mother during the pregnancy and through C.C.'s birth—while also failing to provide

---

[1]Father characterizes his complaints as due-course-of-law violations. Although "the Texas Constitution is textually different [from the United States Constitution] in that it refers to 'due course' rather than 'due process,' we regard these terms as without meaningful distinction" and "have traditionally followed contemporary federal due process interpretations of procedural[-]due process issues." *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995).

[2]Mother had struggled with addiction and mental-health problems.

adequate support or medical care for Mother—and remained apart from C.C. or failed to support C.C.; and (3) knowingly engaged in criminal conduct resulting in his conviction, confinement, and inability to care for C.C. for at least two years from the petition's file date. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(F), (H), (Q). They also alleged that termination of the parent–child relationship was in C.C's best interest. *See id.* § 161.001(b)(2). Aunt and Uncle alleged standing to sue under Family Code Section 102.005 generally. *Id.* § 102.005.

Father filed several documents opposing the suit. On October 26, 2022, the trial court notified the parties that it had specially set the final trial for March 3, 2023. Father filed a formal answer pro se on December 15, 2022. In March 2023, the trial court rescheduled the trial for April 3, 2023, and issued a bench warrant ordering the Tarrant County Sheriff to bring Father to Tarrant County for the April 3 trial.

The parties waived a jury and tried the case to the court. The trial court found that Father had failed to support C.C.; had voluntarily abandoned Mother and failed to support her and C.C.; and had knowingly engaged in criminal conduct resulting in his conviction, confinement, and inability to care for C.C. for at least two years from the original petition's file date. The trial court also found that terminating the parent–child relationship between C.C. and Father—"if any exists or could exist"—was in C.C.'s best interest. The trial court appointed Aunt and Uncle C.C.'s managing conservators and approved an adoption evaluation that had been done.

After appealing the judgment, Father—who had obtained counsel—filed a timely motion to vacate the judgment, in which he asked alternatively for a new trial. According to Father, Aunt and Uncle lacked standing to sue under Section 102.005 because they had not joined their termination suit with an adoption suit. He sought a new trial on legal- and factual-sufficiency grounds, among others. After a hearing, the trial court denied the motion.

## Issues

Father argues on appeal that Aunt and Uncle lacked standing under Family Code Section 102.005; that the evidence is not legally and factually sufficient to support the conduct grounds found by the trial court and the trial court's best-interest finding; and that the judgment violates his due-course-of-law right because (1) he did not receive proper notice of the final trial and all pleadings, (2) the trial court conducted proceedings in his absence after he requested to be present, and (3) Aunt and Uncle did not provide him any required disclosures.

## Standing

### Review standard

We address standing first because "[s]tanding is a constitutional prerequisite to suit" and because "[a] court has no jurisdiction over a claim made by a plaintiff who lacks standing to assert it." *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150 (Tex. 2012). Because standing is a component of subject-matter jurisdiction, its existence is a legal question that we review de novo. *See Farmers Tex. Cnty. Mut. Ins. v. Beasley*,

4

598 S.W.3d 237, 240 (Tex. 2020). In evaluating standing, we construe the pleadings in the plaintiff's favor, and we consider evidence relevant to the jurisdictional inquiry. *See id.* When standing is challenged for the first time on appeal, we review the entire record if necessary to determine if any evidence supports standing. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

Standing in a suit affecting the parent-child relationship (SAPCR) is governed by the Family Code. *See In re E.G.L.*, 378 S.W.3d 542, 547 (Tex. App.—Dallas 2012, pet. denied). A party seeking relief in a SAPCR must allege and establish standing within the parameters of the language used in the relevant statute. *In re K.T.R.*, No. 10-22-00219-CV, 2022 WL 17834491, at *3 (Tex. App.—Waco Dec. 21, 2022, pet. denied) (mem. op.) (quoting *In re Torres*, 614 S.W.3d 798, 801 (Tex. App.—Waco 2020, no pet.)). "Because standing to bring a SAPCR is governed by statute, we apply statutory-interpretation principles in determining whether a plaintiff falls within the category of persons upon whom such standing has been conferred." *In re H.S.*, 550 S.W.3d 151, 155 (Tex. 2018).

Family Code Section 102.005 sets forth who has standing to file "[a]n original suit requesting only an adoption or for termination of the parent-child relationship joined with a petition for adoption." Tex. Fam. Code Ann. § 102.005 (listing (1) a stepparent; (2) an adult with whom the child has been placed for adoption who has had actual possession and control of the child for 30 days before filing suit; (3) an adult who has had actual possession and control of the child for at least two months

5

during the three months preceding the petition's filing; (4) an adult who has adopted, petitioned to adopt, or is a foster parent of the child's sibling; and (5) "another adult whom the court determines to have had substantial past contact with the child sufficient to warrant standing to do so").

**Application**

Father argues that because the termination pleading did not also expressly seek adoption, Aunt and Uncle could not rely on Section 102.005 to show standing. He does not argue that they failed to show they fall within one of the categories of persons with standing to seek adoption under Section 102.005.

In their original petition, Aunt and Uncle sought to terminate Father's parental rights but also sought an "order in accordance with the allegations of th[e] petition." In other parts of the petition, Aunt and Uncle gave fair notice of their intent to adopt C.C. by referencing adoption-specific Family Code requirements and by specifically requesting that the court order an adoption evaluation. *See id.* § 162.002 (requiring adoption suit to include either a verified allegation that the petitioner has complied with the Interstate Compact on the Placement of Children or a verified statement of the particular reasons for noncompliance), § 162.003 (requiring adoption evaluation); *T.L. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-14-00361-CV, 2014 WL 6845166, at *3 (Tex. App.—Austin Nov. 26, 2014, no pet.) (mem. op.) (applying fair-notice pleading requirement in Family Code case); *see also In re Y.J.*, No. 02-19-00235-CV, 2019 WL 6904728, at *6–7 (Tex. App.—Fort Worth Dec. 19, 2019, pets. denied)

6

(mem. op.). The judgment contains the following finding: "The court finds that the required adoption evaluation has been performed and the evaluator's report is on file herein. The Court further finds that the adoption evaluation meets the requirements of the Court."[3]

Moreover, the entire record shows that Aunt and Uncle had also filed a petition for adoption, albeit in a different cause number. At the hearing on the motion to vacate, counsel for Aunt and Uncle reminded the trial court that they had filed an adoption petition in Cause Number 231-718286-22 and that the reporter's record from the termination trial "reflect[ed] several comments about adoption." When counsel told the trial court, "The adoption could have proceeded that day; however, you . . . correctly decided it would be better to wait until his time to appeal had passed," the trial judge responded, "Correct." *Cf. Rodarte v. Cox*, 828 S.W.2d 65, 71 (Tex. App.—Tyler 1991, writ denied) (addressing standing issues in suit to terminate and adopt in which trial court severed adoption part of suit after a jury had decided the termination—but not the adoption—issues because statute precluded jury trial on adoption claim).

---

[3]Father contends that the notice of final trial did not include any mention of adoption, instead listing conservatorship, possession and access, child support, and termination of parental rights as the issues to be tried. The notice was directed to Aunt and Uncle's counsel, Father, and C.C.'s attorney ad litem. Father's argument assumes he would have standing to participate in proceedings regarding the merits of adoption. But upon termination of parental rights, the parent no longer has standing to contest an adoption. *See Ramirez v. Dep't of Fam. & Protective Servs.*, 667 S.W.3d 340, 349 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

Based on these specific facts, we conclude that the termination and adoption suit were sufficiently joined for purposes of establishing Section 102.005 standing.

Testimony at the trial showed that C.C. had lived exclusively with Aunt and Uncle for a little over two and one-half months of the three-month period preceding the suit's file date. Based on our review of the entire record, we hold that Aunt and Uncle showed standing to sue under Family Code Section 102.005(3)—they had actual possession and control of C.C. for at least two months during the three months preceding the petition's filing. Thus, we overrule Father's first issue.

## Sufficiency of evidence supporting conduct-ground Q

In his second through fourth issues, Father challenges the evidence's legal and factual sufficiency to support the conduct grounds supporting termination: F, H, and Q. Tex. Fam. Code Ann. § 161.001(b)(1)(F), (H), (Q). We need address only one conduct-ground finding if sufficient evidence supports it. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Here, the evidence is legally and factually sufficient to support termination under Q.

### Standard of review and applicable law

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the

factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the movant proved the specific ground for termination. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

Under Section 161.001(b)(1)(Q), termination can be based on a parent's knowing criminal conduct "that has resulted in the parent's . . . conviction of an offense[] and . . . confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." *Id.* § 161.001(b)(1)(Q).

9

Termination according to this predicate ground requires proof that the parent is unable to care for the child for at least two years from the petition's file date. *In re E.K.*, No. 02-22-00355-CV, 2023 WL 2325510, at *3 (Tex. App.—Fort Worth Mar. 2, 2023, pet. denied) (mem. op.). Although a parent may fulfill his child-care obligation by arranging for another person to provide that care on his behalf, "[s]imply arranging for the . . . care is not enough—the person agreeing to care for the children must agree to do so *on behalf* of the incarcerated parent." *Id.*

Additionally, although parole-related evidence is relevant, "[m]ere introduction of parole-related evidence . . . does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years [because p]arole decisions are inherently speculative." *In re O.P.*, No. 02-22-00292-CV, 2022 WL 17494597, at *4 (Tex. App.—Fort Worth Dec. 8, 2022, no pet.) (mem. op.) (quoting *H.R.M.*, 209 S.W.3d at 108). And a factfinder "is 'free to disregard' the parent's parole-related testimony, especially when it constitutes 'barely more than conjecture.'" *Id.* at *4 (quoting *In re C.L.E.E.G.*, 639 S.W.3d 696, 699 (Tex. 2022)).

**Application**

The trial court admitted into evidence the judgment from Father's conviction for aggravated assault with a deadly weapon, which showed that Father's five-year confinement was to begin July 6, 2021. Father agreed at trial that his projected release date was October 2, 2025. Because Aunt and Uncle filed their original petition on

10

June 6, 2022, his projected release date was over two years from the date of the petition's filing.

In a narrative to the court, Father said, "Today I was supposed to see parole. I was supposed to see parole today. I'm eligible today for parole, you know. I'm sure they'll come see me in the County or, you know, maybe I'll parole out the County or something. I don't know." No other parole-related evidence was presented.[4] The trial court was not required to believe Father's bare assertion about the potential for parole.[5] *See H.R.M.*, 209 S.W.3d at 109.

Father testified that he wanted C.C. to continue to live with Aunt and Uncle until his release but with his fiancée providing financial support on his behalf. His fiancée testified that she would provide "whatever it takes" financially on Father's behalf.[6] Aunt, on the other hand, testified that she wanted Father's rights terminated

---

[4]In his brief, Father asserts that he "is currently in the parole review process, and it is not certain that he will remain confined past two years from the date of filing, which would be June 6, 2024."

[5]Likewise, the trial court did not have to believe Father's testimony that he had not intended to commit the underlying offense for which he was convicted and had instead run over Mother by accident. The evidence showed that Father pleaded guilty to aggravated assault with a deadly weapon based on an indictment that charged only an intentional and knowing act.

[6]Contrary to the argument in Father's brief, his fiancée did not agree to care for C.C. in her home while he was incarcerated for aggravated assault; she agreed to provide only financial support while C.C. continued to live with Aunt and Uncle. And although his fiancée agreed that after Father's release, she would be "on the hook" to raise C.C. if he were to again go to prison, that agreement is not sufficient to prove that she had agreed to allow C.C. to live with her during Father's current confinement.

11

for C.C.'s permanency. She did not think Father could safely parent C.C. while incarcerated. Thus, the evidence did not show that Aunt and Uncle had agreed to care for C.C. on Father's behalf.

Based on the foregoing, we hold that the evidence is both legally and factually sufficient to support the Q finding. We overrule Father's fourth issue and therefore do not address his second and third issues. *See A.V.*, 113 S.W.3d at 362.

## Best interest

In his fifth issue, Father argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding. We apply the same sufficiency standard of review to this finding as we do to the conduct finding. *See In re J.W.*, 645 S.W.3d 726, 741, 746 (Tex. 2022).

**Applicable law**

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In reviewing best-interest evidence, we consider nonexclusive factors that the factfinder may apply:

(1) the child's desires;

(2) the child's current and future emotional and physical needs;

(3) the current and future emotional and physical danger to the child;

12

(4) the parenting abilities of those seeking custody and programs available to assist them;

(5) the parties' plans for the child, including the stability of the proposed home or placement;

(6) the parent's acts or omissions suggesting that the existing parent–child relationship is inappropriate; and

(7) any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Additionally, evidence probative of conduct grounds for termination may also be probative of best interest. *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).

**Application**

Based on the evidence summarized below—whether viewed in the light most favorable to the jury's best-interest finding or neutrally—we hold that the trial court could have found by clear and convincing evidence that termination of the parent–child relationship was in C.C.'s best interest. *See J.P.B.*, 180 S.W.3d at 573; *C.H.*, 89 S.W.3d at 28.

- Second *Holley* factor[7]: C.C. needed a stable and permanent home. C.C. had been present when Mother died and because of that had experienced night terrors and insomnia. She also cried a lot, missed Mother, and talked to a poster of Mother. Aunt and Uncle had taken her to therapy, given her a photo album of her own with pictures of Mother, and allowed her to draw pictures for and write letters to Mother. Although C.C. had experienced attachment issues, they were getting better. C.C. was still "clingy" with Aunt and Uncle from time to time. C.C. had a younger half-sibling—Father's child with his

---

[7]C.C. was not quite four at the time of trial; no evidence pertained directly to her desires or maturity to express any (first *Holley* factor).

fiancée; no evidence was presented about whether C.C. had a relationship with her half-sibling.

• Fourth *Holley* factor: Aunt was a licensed professional counselor and able to meet C.C.'s needs. Aunt and Uncle had also cared for C.C.'s first cousins in their home while their father was deployed. Those cousins treated C.C. "like siblings." Aunt testified that she was able to seek parenting advice from family members and colleagues.

• Fifth *Holley* factor:

  • C.C. was bonded to Aunt and Uncle, was happy and doing well in their home, and attended preschool. They planned to adopt her. C.C. started "spending a great deal of time with" Aunt and Uncle when she was three to four months old, began living with them "on a fairly routine basis" when she was two, and by the time of trial, had lived with them exclusively for the year after Mother's death. When Aunt and Uncle had cared for C.C. while Mother was alive and not doing well mentally, they were C.C.'s "safety net." They had a place for her in their home, including "an appropriate place to sleep and toys to play with." C.C.'s grandmother thought that Aunt and Uncle's home would be "the best place for her."

  • Father wanted C.C. to live with Aunt and Uncle until his release from prison while his fiancée sent C.C. gifts, clothes, and financial support—"a trillion dollars, whatever [C.C.] needs." He had no concerns about their care. His long-term plan was to put her in swimming lessons, live in his fiancée's rented home on a two-acre plot, enroll C.C. in the school where his fiancée taught, and "put her in whatever she wants to do." Eventually, he wanted C.C. and her younger brother "to grow up together."

• Third and sixth *Holley* factors:

  • Father had "been incarcerated most of his adult life." Father and Mother met after he had been released from prison and was on parole. They moved in together, but Mother paid all the bills with help from her mother. Mother and Father were eventually evicted. They had several fights while together, including during Mother's pregnancy with C.C.; the police were called "[m]ore than once." Mother and Father had an "off and on" relationship.

  • At the time of trial, Father was incarcerated because of a domestic-violence incident with Mother; he had run "over [Mother's] arm with the

14

car, in a moving vehicle that he was operating." Father was on the run for ten months—without providing for C.C.—before he was jailed for the offense. After his arrest, he called Mother's family members and threatened to kill them. Mother had "begged" Aunt to keep C.C. safe after Father threatened Mother and C.C. because Mother had testified at his aggravated-assault trial.

- Father did not consistently call C.C. or come see her in person and "did not readily accept" her as his child "from the beginning." Aunt did not think that Father had met his financial obligations and had not been "a consistent physical presence" for C.C. In the past, Aunt had seen Father smoking marijuana with C.C. in the car. Father had returned to C.C.'s grandmother pictures of C.C. that Mother had sent him. C.C.'s grandmother agreed when asked whether "it would be extraordinarily harmful" to C.C. to be taken out of Aunt and Uncle's home and whether "she would be shattered." According to C.C.'s grandmother, nobody from Father's family had offered to be a placement for C.C., and Father had never contacted her to say he had found someone willing to support C.C. She agreed when asked if she was afraid C.C. would witness or experience family violence if Father had custody.

- Seventh *Holley* factor: The trial judge did not have to believe Father's version of events leading up to his aggravated-assault conviction—that he had accidentally run over Mother when her bags got stuck in the car, left the scene not knowing that he had run her over, and pleaded guilty because his attorney told him that Mother was going to testify against him to avoid a then-pending charge against her. The judge also did not have to believe Father's testimony that while he was evading police on the aggravated-assault charge, he and Mother would meet without her family's knowledge and that he visited with C.C. and provided her financial support. Likewise, the trial judge did not have to believe Father's explanation that he had supported Mother financially but that she lied to her family about his not helping so that she could get extra money for drugs. Finally, the trial judge did not have to believe Father when he testified that he had tried to contact C.C.'s grandmother at her church to tell her that his fiancée would provide C.C. with anything she needed.

Considering the evidence pertinent to all of these factors, they weigh heavily in

favor of the best-interest finding; thus, this evidence is both legally and factually

15

sufficient to support the trial court's finding that termination of the parent–child relationship is in C.C.'s best interest. We overrule Father's fifth issue.

## Due-course-of-law complaint

In his sixth issue, Father contends that his parent–child relationship with C.C. was terminated without due course of law because (1) he was not properly notified about the "instructions for submitting evidence" for the final trial according to Rule 21(b), (2) "[t]he record is unclear as to whether [he] did in fact receive all notice and pleadings filed in the trial court as there is no return receipt for many of the mailings to Appellant where he was incarcerated," (3) the day after he filed a request to appear at hearings via video, the trial court held a pretrial conference "without [his] presence," and (4) Aunt and Uncle did not serve him with required disclosures under Rule 194.

Father's arguments have no merit. He did not preserve a complaint that he lacked proper notice of "instructions for submitting evidence" under Rule 21(b), nor did he preserve a complaint that Aunt and Uncle failed to provide him required disclosures. *See* Tex. R. App. P. 33.1(a)(1); *cf. Morales v. Carlin*, No. 03-18-00376-CV, 2019 WL 1388524, at *6 n.9 (Tex. App.—Austin Mar. 28, 2019, no pet.) (mem. op.) (holding discovery-violation complaint waived under prior version of rule). Father identifies no particular "notice, pleading, plea, or other form of request" of which he did not receive adequate notice, nor does he allege any particular harm regarding lack of notice; he was able to file documents pretrial, attended and participated in the trial

16

by examining witnesses and presenting argument, and timely filed a postjudgment motion. *See* Tex. R. App. P. 38.1(i), 44.1(a)(1); *Leachman v. Stephens*, No. 02-13-00357-CV, 2016 WL 6648747, at *33 (Tex. App.—Fort Worth Nov. 10, 2016, pet. denied) (mem. op.); *see also T.L. v. Cook Children's Med. Ctr.*, 607 S.W.3d 9, 83–84 (Tex. App.—Fort Worth 2020, pet. denied) (discussing case-specific due-process requirement of adequate notice). And finally—although nothing shows that Father's request to appear by alternate means had been presented to the trial court before the pretrial conference—Father has nevertheless failed to show harm regarding the trial court's failure to secure his attendance at the pretrial conference. *See* Tex. R. App. P. 44.1(a)(1).

We overrule Father's sixth issue.

### Conclusion

Having overruled Father's six issues, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: September 14, 2023

17